NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0406n.06

Nos. 07-4385/07-4386

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 04, 2009
LEONARD GREEN, Clerk

EDWARD LENTZ, JR.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　Plaintiff-Appellee/Cross-Appellant,　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　ON APPEAL FROM THE UNITED
　　　　　　　　　　　　　　　　　　　)　STATES DISTRICT COURT FOR THE
CITY OF CLEVELAND; EDWARD F.　　)　NORTHERN DISTRICT OF OHIO
LOHN; SANFORD E. WATSON,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　Defendants-Appellants/Cross-Appellees.　)

Before: GUY, CLAY and COOK, Circuit Judges.

COOK, Circuit Judge. Edward Lentz, Jr., a white Cleveland police officer, sued the City of
Cleveland and various officials ("Defendants") for discriminating and retaliating against him after
he shot the adolescent black driver of a stolen vehicle. A jury agreed with Lentz, awarding him
$800,000 in damages. Defendants challenged the sufficiency of the evidence and the court's
evidentiary rulings, and sought a remittitur though a Rule 50 motion. On appeal, Defendants
challenge the district court's denial of that motion. Lentz cross appeals. We reverse and remand the
district court's denial of the remittitur, but affirm the other aspects of its denial of Defendants' Rule
50 motion. We also deny the cross-appeal.

I.

The shooting occurred while Lentz guarded the home of Mayor-elect Jane Campbell in 2001. He observed a station wagon proceed erratically down the street and abruptly stop behind his squad car. As Lentz approached, the car backed up, hit a tree, and Lentz somehow ended up on its roof. To get the car to stop as it drove toward an intersection—with him on top—Lentz fired fourteen rounds through its roof, injuring the black juvenile driver.

The Police Department ("Department") assigned Lentz to police gymnasium duty pending an investigation and it is the lengthy duration of this assignment that spurred Lentz's complaint— he spent 652 days on gym duty, much longer than the time typically served by officers involved in shootings. The Use of Deadly Force investigation team ("UDF") completed its investigation within a normal time frame and the assistant prosecutor submitted a felonious-assault charge to a grand jury. But before the grand jury could decide whether to indict Lentz, a Department official—Lieutenant Robert Klimak—withdrew the case from grand jury consideration and retained the file for some five months—from April to October 2002—before he returned it to the chief prosecutor.

The prosecutor resubmitted the felonious-assault charge and added a misdemeanor count of providing false information to the UDF. The grand jury indicted Lentz on the falsification charge only; the court later dismissed the charge. The Department then filed departmental disciplinary charges against Lentz for (1) violating the "use of force" policy; (2) lying about the shooting; and (3) failing to notify dispatch before approaching the vehicle. Lentz conceded the "failure to notify"

charge and the Department dismissed the others.  On September 17, 2003, nearly 22 months after

the shooting, the Department reinstated Lentz with back pay.

In his state court complaint, Lentz alleged a variety of claims against the Defendants, who

removed the case to federal court.  That federal jury found that the Defendants unlawfully

discriminated and retaliated against Lentz, and found the City liable under Section 1983.  When

Defendants moved for judgment as a matter of law, a new trial, or remittitur, the district court

refused.  On appeal, Defendants contend that:  the evidence fails to support the jury's verdict; that

the district court erred in six evidentiary rulings; and that the jury awarded excessive damages.  Lentz

cross-appeals the denial of his motion for prejudgment interest.

II.

We first address Defendants' claims relating to the denial of their Rule 50 motion for

judgment as a matter of law.  We review de novo.  *White v. Burlington N. & Santa Fe Ry. Co.*, 364

F.3d 789, 794 (6th Cir. 2004) (en banc).[1]  Defendants assert that sufficient evidence did not support

the jury's findings that: (1) Defendants discriminated against Lentz; (2) Defendants retaliated against

Lentz for engaging in protected activity; and (3) the City had a municipal policy to discriminate

---

[1]Though we review the denial of Defendants' alternative motion for a new trial under the more deferential abuse of discretion standard, *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 424 (6th Cir. 1999), because we find the district court's decision survives de novo review, it clearly did not abuse its discretion.

against white officers, and more particularly to retaliate against Lentz, in violation of 42 U.S.C. §

1983. We address each argument in turn.

## A. Evidence of Discrimination

The familiar *McDonnell Douglas* framework guides Lentz's discrimination claims under

federal and Ohio law. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Little Forest*

*Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991). To establish

a prima facie case, a plaintiff must demonstrate: (1) membership in a protected group;[2] (2) that the

plaintiff was qualified for the position; (3) that the plaintiff was subject to adverse employment

action; and (4) that the plaintiff was treated differently than similarly situated employees. The

burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action,

after which the plaintiff must demonstrate that the proffered reason is a pretext for discrimination.

*McDonnell Douglas*, 411 U.S. at 802–04.

Following a trial on the merits, our review focuses on the "ultimate question of

discrimination," and not the prima facie case. *Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 720 (6th Cir.

2004) (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001)).

---

[2]The Sixth Circuit imposes a more demanding test in reverse-discrimination cases. *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) ("[T]o satisfy the first prong of the *prima facie* case, the plaintiff must demonstrate background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.") (internal quotation marks omitted). We need not address this prong of the modified test because the Defendants do not raise it on appeal.

Nonetheless, Defendants dispute the individual elements, particularly whether (1) adverse employment action occurred, and (2) the other employees are similarly situated. We need not address either argument because "our duty . . . is simply to determine whether [plaintiff] produced sufficient evidence to support the jury's finding of intentional discrimination." *Noble*, 391 F.3d at 721.

We also decline to address the argument that the district court improperly took the adverse employment action element away from the jury, finding that Defendants' failure to raise the issue in their Rule 50(a) motion precluded them from raising it in a post-verdict motion for judgment as a matter of law. Defendants' oral motion mentioned adverse employment action only as part of a generalized objection to the sufficiency of the evidence. And while we agree that "[t]echnical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied," *Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006) (quoting *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996)), this is not such a case. Rule 50 serves to "alert the opposing party to the insufficiency before the case is submitted to the jury," *Scottish Heritable Trust*, 81 F.3d at 610, but Defendants' conduct undermined that purpose. As Judge O'Malley explained:

> [Y]ou never sought reconsideration from that finding from Judge Manos, so that's why I conclude that he had already made that finding, that the parties relied on that finding in preparing and presenting the case, and frankly, I had relied on that finding throughout.

Neither do we find Defendants' objection sufficient under Rule 51, which requires that "[a] party who objects to an instruction or the failure to give an instruction *must do so on the record, stating distinctly the matter objected to and the grounds for the objection.*" Fed. R. Civ. P. 51(c)(1) (emphasis added). Defendants' murky attempt to preserve some objection to "the assignment of gymnasium duty as adverse employment" fails Rule 51's clarity requirement. Indeed, coming hard on the heels of Judge O'Malley's Rule 50 decision, it is not clear whether this objection even *pertained* to a specific jury instruction.

As for the sufficiency of the evidence, Lentz presented extensive evidence about gym duty, departmental charges, and the experiences of other officers. Testimony described gym duty as particularly unpleasant. And Lentz employed circumstantial evidence to link his unique treatment to a discriminatory motive: African-American officers involved in shootings served much shorter gym details—the longest, 254 days, was less than half Lentz's assignment. Defendants seek to discredit that evidence by arguing that those officers had different experiences, but "similarly situated" only requires comparability in "all relevant respects," not congruent experiences. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Many of these officers participated in automobile-related shootings and received gym duty assignments while under investigation pursuant to the relevant Departmental procedures; they fit the requirements of *Ercegovich. See id.*

Sufficient evidence also supports the jury's finding that Defendants' nondiscriminatory reasons were pretextual. A plaintiff can establish pretext by showing that the reasons: (1) have no basis in fact; (2) did not motivate the decision; or (3) are insufficient to explain the adverse action. *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003). Lentz cast doubt on Defendants' reasons through evidence that, although the UDF investigation finished in three months, Lieutenant Klimak took the file back for the unspecific reason that he wanted to "take a closer look" at the case. Other evidence highlighted Safety Director Draper's concerns with race relations and his desire to avoid "another Cincinnati," referring to large-scale race riots.

Circumstantial evidence undermined Defendants' nondiscriminatory reasons. For example, the five officers with the longest gym details were white officers who shot black suspects. Moreover, Lentz offered evidence that City officials discussed handling shootings of black suspects "with care" to avoid "civil unrest"; that Draper met with the Cleveland NAACP President, who expressed race relations concerns; and that officials discussed the Cincinnati riots. The court even admitted news clips and a summary of television coverage of the shooting to highlight its "high profile" nature. Given this evidence, the jury could reasonably conclude that Defendants' espoused reasons were a pretext for the City's discriminatory decision to treat Lentz more harshly than it would similarly-situated black officers. Accordingly, Defendants have not presented a reason to surmount the "substantial deference owed a jury verdict." *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 613 (6th Cir. 2007).

B. Evidence of Discriminatory Policy

Turning to municipal liability, Defendants contend that the jury could not reasonably conclude from the evidence that the City had an official policy or custom of discrimination. Such a policy or custom is a prerequisite for a plaintiff to hold a city liable for a constitutional violation. *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658 (1978). Even a single policymaker's decision can constitute official policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), but that policymaker must possess "final authority to establish municipal policy with respect to the action ordered," *id.* at 482. Likewise, a subordinate's decision may support municipality liability if ratified by an authorized policymaker. *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993).

Sufficient circumstantial evidence exists to permit the jury to conclude that City policymakers either discriminated against him themselves or ratified a subordinate's decision to do so. Lentz proffered evidence that Director Draper issued and ratified departmental charges, including the amended charges that extended Lentz's gym duty by two months. Draper conceded as much, and his authorization of the charges constitutes city policy under *Monell*. *See Monell*, 436 U.S. at 694. Moreover, Lentz presented evidence that the Director and the Mayor repeatedly discussed the case's political risks. Those discussions—which suggest that City officials worried about the racial component of the shooting—together with Draper's authorization of Department charges, furnish sufficient evidence for the jury to reasonably conclude that a policymaker made or

ratified a discriminatory decision.  Accordingly, we reject Defendants' challenge to the sufficiency of the evidence supporting municipal liability.

## C.  Evidence of Retaliation

The *McDonnell Douglas* framework also applies to Lentz's retaliation claim.  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).  To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) the plaintiff engaged in protected activity; (2) the protected activity was known by the defendant; (3) the defendant took "materially adverse" action against the plaintiff; and (4) the protected activity and adverse action were causally connected.  *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).  As with the discrimination claim, a plaintiff must respond to an employer's nonretaliatory reason by showing that the proffered reason was pretext for retaliation.  *Id.*

We need only consider whether sufficient evidence supported the knowledge and adverse-action elements.  Defendants stipulated that Lentz engaged in protected activity when he filed an EEOC complaint.  As for causation, Defendants' failure to challenge it in their Rule 50(a) motion barred raising it in a post-verdict motion for judgment as a matter of law.

Lentz introduced evidence of the other two elements at trial.  Regarding knowledge, he showed that the "Chief's Office" received his grievance and that Director Draper knew Lentz filed an EEOC charge.  And the same evidence that supported the discrimination claim—that gym duty

was unpleasant, perceived as a form of punishment, and deprived Lentz of opportunities for additional pay—supports finding adverse action.

Finally, as to pretext, the district court gave the jury clear instructions:

[i]n order to prove that defendants City of Cleveland's alleged explanation is a pretext for impermissible retaliation, plaintiff Edward Lentz must show both that the explanation is false and that retaliation was the real reason the defendant took the adverse action.

The court acknowledged that the evidence of pretext was not as strong as with respect to the discrimination claim. Nonetheless, Lentz presented evidence that this was a high-profile case discussed by policymakers, including Mayor Campbell and Director Draper. Keeping in mind the jury's right to make all relevant credibility determinations, the jury could reasonably conclude that Lentz's protected activity motivated the policymakers. The jury heard this evidence, received clear instructions, and determined that the City unlawfully retaliated against Lentz. That evidence suffices; we will not upset the jury's verdict.

### D. Evidence of Retaliatory Policy

Sufficient evidence also supports the verdict finding the City liable for retaliation under 42 U.S.C. §§ 1981 and 1983. As with his discrimination claim, Lentz adduced evidence that Director Draper personally ratified the departmental charges while aware of the EEOC grievance. Likewise, the circumstantial evidence that policymakers discussed Lentz's case supports the jury's inference

of a decision to unlawfully retaliate against Lentz.  Accordingly, we leave undisturbed the jury's

finding of municipal liability.

III.

Defendants attack six of the district court's evidentiary rulings.  In holding that these rulings

did not furnish grounds for judgment as a matter of law, the district court properly applied Rule 61

of the Federal Rules of Civil Procedure:

> [N]o error in admitting or excluding evidence . . . is ground for granting a new trial,
> for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a
> judgment or order.  At every stage of the proceeding, the court must disregard all
> errors and defects that do not affect any party's substantial rights.

In our fresh review, we apply the same standard and conclude that the district court did not err.  *See*

*White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (en banc).  None of

the evidentiary rulings prejudiced Defendants' substantial rights.

A.  Witnesses

First, Defendants assert that Officers Joseph Paskvan and James Simone, and union president

Robert Beck, offered improper opinion testimony.  But the court carefully limited their testimony

to evidence based on firsthand knowledge.  It repeatedly sustained Defendants' objections and

reminded the witnesses about the permissible scope of their testimony.  Given that careful restriction,

we do not find that this testimony affected Defendants' "substantial rights."

### B.  News Stories

Second, Defendants contend that the district court erred in allowing Lentz to refer to news stories about the shooting, which they insist constituted prejudicial hearsay.  But these references merely confirmed that the City's policymakers were aware of the "high profile" nature of the case; Lentz did not seek to convince the jury of their truth.  *See* Fed. R. Evid. 801.  Moreover, the district court strictly limited this evidence—it only permitted Lentz to show the jury one of the fifty news clips, even though the jury requested more.  Because the court circumscribed these references to relevant, nonhearsay purposes, we cannot find that they prejudiced the Defendants' substantial rights.

### C.  EEOC Charges

Third, Defendants allege prejudice from the court allowing Lentz to include in his testimony references to the City's release of his medical records—the subject of his EEOC charge.  But the district court similarly limited Lentz's references to the alleged release, and even instructed the jury that "there is no evidence that the City actually released his medical records."  Given these limits, Defendants fail to show the requisite prejudice.

### D.  Dr. Steinberg's Testimony

Fourth, Defendants object to the testimony of Dr. Joel Steinberg, an expert witness who testified about Lentz's emotional and psychological damages.  But while they purport to argue the

unreliability and irrelevance of his testimony, their challenge focuses primarily on credibility—a matter for the jury to settle—and not admissibility.

### E. Grand Jury

Fifth, Defendants assert that the district court erred by allowing Lentz to refer to the grand jury's failure to indict him for felonious assault. That reference, they argue, prejudiced them because the jury could assume that Defendants charged Lentz without probable cause. But no substantial prejudice resulted when the jury also heard from the Prosecutor that the failure to indict is common and does not imply the absence of probable cause.

### F. Similarly Situated Employees

Defendants maintain that other officers' testimony should have been excluded as those officers were not similarly situated. As we explained in evaluating the evidentiary sufficiency for the discrimination claim, however, the experiences of those officers were sufficiently comparable in the relevant respects. *See Ercegovich*, 154 F.3d at 352. Further, the court instructed the jury to determine for itself whether these officers were similarly situated.

### IV.

Defendants contend that the district court erred by denying a remittitur because the evidence adduced on damages cannot support an $800,000 award. We review for abuse of discretion, *Gibson*

*v. Moskowitz*, 523 F.3d 657, 663 (6th Cir. 2008), noting that a district court may reduce an excessive jury award if "it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss," *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). But rather than evaluate the evidence supporting the jury award, the district court rested its denial on the failure to propose interrogatories to test the jury verdict: "Having not objected to the absence of interrogatories requiring the jury to parse out its award, Defendants are left without firm ground to argue that any particular basis for the jury's award is without support." We view it differently, though, because subtracting the maximum economic-damages award Lentz's evidence could support leaves a remainder of some $700,000 to compensate for his temporary emotional harm, a sum that manifests "plain injustice," and an abuse of discretion. *See Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102, 1106-09 (6th Cir. 1984).

Lentz proffered evidence of two kinds of damages: "economic" and "emotional." The economic category sought compensation for (1) lost extended tour (overtime), court, lunch, and compensatory time, and (2) lost opportunity to obtain secondary employment. Lentz testified that while on gym duty he was ineligible for additional pay that active officers received as follows: $16,620.79 in lost "court time"; $10,147.77 in lost extended tour time; and $2,336.42 in lost lunch time. Lentz also testified that he lost $11,527.20 in compensatory time—"overtime that you would get, but you wouldn't be paid for it. It would go on the books." Finally, Lentz presented testimony from several colleagues that officers on gym duty could not pursue secondary employment, costing,

by his estimate, another $52,000 in lost part-time bricklaying work. All told, his evidence supported a maximum of $92,632.68 in economic losses. Given the total verdict of $800,000, the excess over $92,632.68 left $707,367.32 as allocable to his emotional harm. We thus examine the testimony underpinning that valuation.

On that score, Lentz presented testimony of other officers describing gym detail as "house arrest" and "the Black Hole of Calcutta." Lentz himself explained that Defendants' treatment of him made him feel punished and betrayed and that the investigation "put [his] reputation and honor in question" and "put a lot of things on hold." As an example of things on hold, Lentz explained that he might have married his wife and started a family sooner, but did not want to subject others to his ordeal. His psychological expert witness, Dr. Steinberg, testified that Lentz became depressed and suffered from an "adjustment disorder" that left him viewing gym duty like "going to jail or being in a coffin." Steinberg reported that Lentz "had troubles with irritability and anger and isolation from friends and family, and a sense of being a pariah or a black sheep." But Steinberg also admitted that the disorder proved to be temporary; it lasted "the time that [Lentz] was confined to the gymnasium and for a few months after he returned to work where he sort of had kind of a struggle to get back up to speed." Assuming that the "few months" would be another three, Lentz's emotional strain—consisting of an adjustment disorder, as well as feeling depressed and betrayed—lasted just over two years and produced no ongoing emotional harm.

Defending the award against the City's claims of excessiveness, Lentz cites the large awards compensating other discrimination plaintiffs for emotional harm. Yet unlike those plaintiffs, Lentz's emotional problems ended, and he did not lose his job, pay, benefits, or position. For that matter, his award is much higher than plaintiffs that suffered more emotional harm. *See Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003) ($500,000 per plaintiff); *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005) ($400,000); *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469 (6th Cir 2005) ($250,000); *Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir. 1992) ($350,000). The harm suffered by Lentz is more comparable to discrimination plaintiffs like Jimmie Knight, who received a $150,000 verdict after he "testified at trial regarding his emotional distress, financial hardship, and reduced standard of living resulting from his inability to return to the police force." *Knight v. Metro. Govt. of Nashville & Davidson County, Tenn.*, 136 F. App'x 755, 762 (6th Cir. 2005); *see also Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001) (remitting an award from $300,000 to $150,000 where the plaintiff was "despondent, depressed, down and absolutely utterly discouraged about not being able to [go] back to work").

We thus view the jury's award as excessively compensating Lentz for temporary emotional harm, such that the denial of a remittur here amounts to abuse of the court's discretion. We reverse the district court's denial of the motion for remittitur, and remand for the court to calculate an appropriate remittitur and, if necessary, retry the damages issue. *See Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 425 (6th Cir. 1999).

V.

Lentz cross-appeals the denial of prejudgment interest. We review this decision, too, for abuse of discretion. *Anderson v. Whittaker Corp.*, 894 F.2d 804, 809 (6th Cir. 1990). Prejudgment interest is appropriate if needed to make a plaintiff whole. *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170 (6th Cir. 1996). But awarding prejudgment interest is at the discretion of the district court, *id.*, and the court did not deem it necessary. Moreover, since Lentz did not introduce evidence about when his injuries began, the court could not calculate how much interest, if any, would make him whole. For these reasons, the court did not abuse its discretion.

Finally, Lentz presses that the court erred by not holding that filing criminal charges constitutes adverse employment action. We need not address this issue given the disposition of the other claims.

VI.

We affirm the district court's judgment, reverse the denial of the remittitur, deny Lentz's cross-appeal, and remand for the district court to calculate an appropriate remittitur or hold a retrial on damages.

Nos. 07-4385/07-4386
*Lentz v. City of Cleveland, et al.*

**CLAY, Circuit Judge, dissenting.** There was sufficient evidence adduced at the trial of this case by both sides to permit a verdict to be upheld in favor of either Plaintiff or Defendants. But because the district court improperly took the adverse employment action element away from the jury, rendering the jury's ultimate verdict incomplete, I would reverse and remand for a new trial.

## I.    FACTUAL BACKGROUND

The events from which this litigation arose are worth recounting, inasmuch as they demonstrate the complexity of the case and the extent to which the jury could have drawn different inferences about the Defendants' motives, had the jury been properly instructed.

On December 6, 2001, while assigned to help protect the home of the City of Cleveland's Mayor-Elect, Edward Lentz, who is white, shot and injured an African American twelve-year-old boy driving a car on the Mayor-Elect's street. Lentz was initially placed on administrative leave for three days after the incident, and then spent the next 652 days on gym detail, spending his workday in a gymnasium at police headquarters. On December 21, 2001, approximately two weeks after the shooting, Lentz filed a union grievance because he believed the City had leaked confidential medical records about him to the media. On July 17, 2002, Lentz filed a charge with the Equal Employment Opportunity Commission, also in response to the medical information about him that he believed the City had leaked.

- 18 -

While Lentz was on gym detail, Joseph Petkac, the chief of the police department's homicide division, led the department's investigation of Lentz' use of deadly force, with Lieutenant Robert Klimak, the head of internal affairs at the department, playing a supervisory role. Petkac completed the investigation by January 21, 2002, and then sent the investigation file to Mary Bounds, the City's police chief at the time. Bounds approved the investigation on January 27, 2002, and then sent the file back to Petkac to deliver to the City prosecutor's office. In March 2002, Edward Buelow, who was the City's acting chief prosecutor because the position of chief prosecutor was vacant at the time, referred the case to the county prosecutor to present a possible charge of felonious assault against Lentz to a county grand jury. Lentz does not appear to allege that any of the City's procedures to this point were improper.

In April 2002, before the county prosecutor acted on the case, Lieutenant Klimak called the county prosecutor and asked to have the investigation file back for further investigation. On October 10, 2002, Lieutenant Klimak completed his follow-up investigation of Lentz' case, and sent the file back to the Cleveland prosecutor's office.

Rather than refer the case again to the county prosecutor for a possible presentation to the grand jury, on February 3, 2003, Cleveland's newly appointed chief prosecutor, Sanford Watson, decided to file criminal charges of felonious assault and falsification against Lentz himself. That decision led to Lentz' arrest and a probable cause hearing before the Cleveland Municipal Court, which agreed that there was probable cause and therefore ordered the case to be presented to a grand

jury by the county prosecutor. The City announced the criminal charges against Lentz in a press release that provided updates regarding seven ongoing deadly force investigations. On February 6, 2003, Lentz was suspended without pay pending resolution of the criminal charges, in accord with the City's standard procedures following an officer's indictment on a felony charge. In early April 2003, a grand jury declined to indict Lentz on the felonious assault charge, but did indict him on the falsification charge, which was a misdemeanor. Because Lentz was cleared of the felony charge, his suspension was lifted, he was compensated for the salary that had been withheld during his suspension, and he was sent back to gym detail. On July 23, 2003, a state court dismissed Lentz' falsification charge for lack of evidence.

On February 6, 2003, after the City announced criminal charges against Lentz, the City's safety director, Robert Draper, informed Lentz by letter that the police department would bring departmental charges of felonious assault and falsification against him, and also informed Lentz that he would face the departmental charges after the resolution of the criminal charges. On July 27, 2003, after Lentz was cleared of both of his criminal charges, Safety Director Draper informed Lentz that the departmental charges against him had been amended to add to the charges of felonious assault and falsification a charge of failure to use his radio. On September 4, 2003, at an administrative hearing conducted by the City police department, Lentz pled no contest to the failure-to-radio departmental charge, and the other charges were dropped. On September 24, 2003, the City removed Lentz from gym detail and he was permitted to return to active duty.

On March 30, 2004, Lentz brought a number of claims, including employment discrimination and retaliation claims, against the City and against Police Chief Edward F. Lohn and Watson in their official capacities. For his discrimination and retaliation claims, Lentz identified as adverse employment actions his long tenure on gym duty and the departmental charges filed against him.[1] Lentz' theory for holding the City liable was that the City's top decisionmakers–and Draper in particular–subjected Lentz to the extended gym duty and the departmental charges in order to divert attention away from the increasing use of deadly force by the City's white police officers against African American suspects, and to retaliate against Lentz for complaining that the City had leaked his medical information to the press.

## II.    ANALYSIS

Defendants raise a number of issues on appeal,[2] but their arguments concerning the adverse employment action element of Lentz' discrimination and retaliation claims merit reversal in and of themselves, and it is therefore not necessary to address Defendants' other arguments. Defendants correctly contend that the district court improperly instructed the jury that Lentz' gym detail and departmental charges were adverse employment actions as a matter of law.

[1] Lentz also identified the criminal charges brought against him as an adverse employment action, but the district court rejected the criminal charges as an adverse employment action prior to trial.

[2] In addition to raising the adverse employment action issue, Defendants challenge the sufficiency of the evidence with respect to the jury's ultimate finding of discrimination and retaliation, as well as the City's liability. Defendants also appeal a number of the district court's evidentiary rulings at trial and challenge the jury award as excessive.

Nos. 07-4385/07-4386
*Lentz v. City of Cleveland, et al.*

### A.    Waiver

The majority declines to address this challenge to the district court's jury instruction, finding that Defendants' failure to raise the issue in their Rule 50(a) motion precluded them from raising it in a post-verdict motion for judgment as a matter of law.   The majority's dismissal of the central procedural impropriety in the action ignores both the purpose of the waiver rule and the circumstances of Defendants' Rule 50(a) motion.

The district court's error, and Defendants' properly raised objection to it, flow directly from the unusual and complicated procedural history of this litigation.  Following discovery, Defendants filed a motion for summary judgment with respect to all claims.  Lentz did not file any cross-motion for summary judgment.  On January 18, 2006, the district court, Judge John M. Manos presiding, granted Defendants' motion with respect to the retaliation claim, but denied it with respect to the state and federal discrimination claims.[3]   In denying summary judgment with respect to Lentz' discrimination claims, the district court declared *sua sponte* that "an almost two-year reassignment to gym duty pending an investigation constitutes an adverse employment action." (J.A. at 139.)  In his opinion, Judge Manos did not address whether the City's filing of departmental charges was also an adverse employment action.  On July 11, 2006, the case was transferred to Judge Kathleen O'Malley following Judge Manos' death.  On July 25, 2006, Judge O'Malley reinstated Lentz'

---

[3]The district court also granted Defendants' motion for summary judgment with respect to the ADA, malicious prosecution, abuse of process, unlawful disclosure and invasion-of-privacy claims Lentz raised in his complaint.  The disposition of these claims is not at issue on appeal.

retaliation claim. Accordingly, the parties proceeded to trial on the discrimination and retaliation claims.

At trial, following the close of evidence, Defendants indicated to the court that they intended to move pursuant to Rule 50(a) for judgment as a matter of law. Judge O'Malley told Defendants to do so orally, at that moment. The Defendants stated, as part of an argument comprising a total of three sentences, that "[w]e believe there's been an utter failure of proof on the required elements, and I know it's late and we've gone over these arguments before, but, again, this is supposed to be a race discrimination case, supposed to show adverse employment action." (J.A. at 3312.) The judge immediately denied Defendants' motion from the bench. Moving directly from that denial into the conference to discuss proposed jury instructions, the judge informed the parties that she would instruct the jury that both the gym detail and the departmental charges constituted adverse employment actions as a matter of law. Judge O'Malley explained:

> So I'm going to charge that gym duty and departmental charges are the only adverse actions. . . . While the defendants argue that the departmental charges flow as a matter of course, from the filing of the criminal charges, and there was some testimony that that always happens, first of all, I think there was not sufficient testimony that by law it's required to happen; and secondly, and perhaps more importantly, even when those charges disappeared, the departmental charges, rather than disappearing, were amended and prolonged.

> So I think it would be a fair argument for the plaintiff to argue that if not for the original filing of departmental charges, then the amendment of departmental charges and the continuation of the departmental charges constituted adverse employment actions for which the plaintiff can – which the plaintiff can claim were discriminatory.

. . . [W]hen [the court] was handing out the jury instructions, . . . the City questioned whether or not the decision by Judge Manos that the gym duty constituted an adverse employment action and that the departmental charges constituted an adverse employment action in the context of this case was really a decision as a matter of law or whether Judge Manos had the authority to make that decision as a matter of law when the plaintiff had not moved for summary judgment.

I think that's an easy question. I've reread Judge Manos' opinion and there's no doubt that he concluded there was an adverse employment action. . . . Secondly, while it is true that a Federal Judge normally is not permitted to *sua sponte* enter judgment against a nonmoving party, that goes to the question of notice. Where a party – where the issue is fully joined in front of the Judge and the parties are on notice and have, in fact, invited the Judge to consider the legal effect of a given set of facts, the Judge is permitted to render a decision as a matter of law even if that decision would operate to the disadvantage of the movant.

Finally, having listened to all the testimony, I think that that decision as a matter of law is well-supported. While you certainly did your best to introduce testimony that it's a fun thing to be in gym duty, I think that the unrebutted testimony was that gym duty for two and a half years was an adverse employment action, and that it was viewed by all of the officers who testified as punitive, and you didn't – weren't able to get anybody to concede that staying in gym duty for two and a half years would be something that they would enjoy, even if you got them to say that gym duty for a few months was nice because they could work out.

So I think as a matter of law, even if Judge Manos hadn't reached that conclusion, it would be easy for me to do so. No reasonable juror could conclude that two and a half years in gym duty is not an adverse employment action.

(J.A. at 3313-14.)

Shortly thereafter, when the court began reading through the proposed jury instructions for the parties' review, the following exchange took place:

[DEFENDANTS]: And just so the record is clear, we do object to the, you know, the assignment of gymnasium duty as adverse employment." The court responded: "I think the record is pretty clear."

THE COURT: I think the record is pretty clear.

[DEFENDANTS]: I don't know if it's clear about our objection. I think it's clear about your ruling.

THE COURT: No, I meant your objection is pretty clear.

(J.A. at 3315.)

It is thus clear that Defendants raised the substance of their objection to the district court's treatment of the adverse employment action element in both their Rule 50 motion and during the subsequent jury charging conference. Although "[a] post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion[,]" setting forth the same grounds with "technical precision [in the pre-verdict motion] is not necessary." *Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006). Thus, "'[t]echnical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied.'" *Id.* (quoting *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996)). In *Scottish Heritable Trust*, the decision we cited approvingly in *Kusens*, the court stated that "the two basic purposes of this rule are to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency

- 25 -

before the case is submitted to the jury. *A defendant's objection to proposed jury instructions on grounds pertaining to the sufficiency of evidence issues it seeks to appeal may satisfy these purposes.*" *Scottish Heritable Trust,* 81 F.3d at 610 (quotations and citation omitted) (emphasis added).

Although Defendants' reference to the adverse employment action issue in their initial statement in support of their Rule 50(a) motion was not a model of clarity, Defendants did state that Lentz was "supposed to show adverse employment action." (J.A. at 3314.) Moreover, any ambiguity was clarified by the discussion that immediately followed. First, Judge O'Malley made clear that she understood the substance of Defendants' argument: that the jury should have decided for itself whether the gym detail and department charges constituted adverse employment actions. Judge O'Malley then provided several reasons for why the decision to take this element away from the jury was proper: because Judge Manos held that the gym detail was an adverse employment action as a matter of law; and because in her view the evidence at trial was unequivocal that Lentz' gym detail and departmental charges constituted adverse employment actions. Finally, when Defendants reiterated their objection to "the assignment of gymnasium duty as adverse employment," Judge O'Malley stated that she believed Defendants' "objection is pretty clear." (J.A. at 3315.)

Thus, the purposes of the rule requiring any arguments to be raised in the pre-verdict motion are clearly satisfied here: the court had the chance to re-examine the issue and did so, and Lentz was unquestionably on alert regarding this issue before the case was submitted to the jury. *See Scottish*

*Heritable Trust,* 81 F.3d at 610. Defendants' more specific objection to the proposed instructions not only occurred immediately after their formal presentation of their Rule 50(a) motion, but it also appropriately took place during the conference to discuss the proposed jury instructions. *See id.* ("A defendant's objection to proposed jury instructions on grounds pertaining to the sufficiency of evidence issues it seeks to appeal may satisfy these purposes."). I therefore take exception to the majority's dismissal of Defendants' argument concerning the existence of an adverse employment action argument on the ground that Defendants failed to raise the issue in their Rule 50(a) motion.

Furthermore, it is unclear why Defendants would have been required to raise this objection as part of their Rule 50(a) motion in the first place. Federal Rule of Civil Procedure 51 governs objections to jury instructions. "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "An objection is timely if[] a party objects [during the conference on the court's proposed jury instructions]." Fed. R. Civ. P. 51(c)(2)(A). Defendants clearly met their obligations under Rule 51. They appear to have initially objected off the record, while the proposed jury instructions were handed out at the start of the charging conference. Yet Judge O'Malley acknowledged on the record that Defendants had made this objection, and addressed it at length. Then, to be sure to preserve their objection, Defendants stated that they were concerned that their objection had not been preserved on the record, but that, "just so the record is clear, we do object to the, you know, the assignment of gymnasium duty as adverse employment." (J.A. at 3315.) I fail to see why Defendants needed to say anything more to preserve their right to raise the

impropriety of the jury instruction on appeal. In their appellate brief, Defendants renewed their argument that the jury instruction was improper. *Appellant's Br.* at 10-11.

The majority opinion, in finding that Defendants waived their objection to the adverse employment action instruction, approvingly quotes from Judge O'Malley's response to Defendants during the charging conference: "[Y]ou never sought reconsideration from that finding from Judge Manos, so that's why I conclude that he had already made that finding, that the parties relied on that finding in preparing and presenting the case, and frankly, I had relied on that finding throughout." (J.A. at 3314.) Putting aside for the moment the problem that Judge O'Malley's instruction was far broader than Judge Manos' order–Judge Manos found that only the gym detail was an adverse employment action, and only with respect to Lentz' discrimination claim, since he had actually *dismissed* the retaliation claim in that same order–the majority apparently believes that for the reasons Judge O'Malley provided, Lentz did not have sufficient notice that Defendants objected to the adverse employment action ruling. Yet, as the majority even recognizes, Defendants only needed to "alert the opposing party to the insufficiency *before the case [was] submitted to the jury*" to preserve their right to appeal. Majority Op. at 5 (emphasis added). Defendants clearly did so, during their Rule 50 motion and the ensuing charging conference.

Moreover, to the extent that the majority labors under the misapprehension that Lentz' subsequent reliance upon Judge Manos' ruling in preparing for trial can be a basis for finding that Defendants waived their right to appeal, it is worth remembering that the district court's order

granting partial summary judgment to Lentz with respect to the adverse employment action element was a non-final order. *See Bonner v. Perry*, 564 F.3d 424, 427 (6th Cir. 2009) ("A grant of partial summary judgment that does not dispose of all parties and all claims is generally not immediately appealable unless the district court issues a Fed. R. Civ. P. 54(b) certificate."). Whenever a non-final order contains reversible error, the parties' subsequent reliance on that order may be for nought. But Defendants were certainly not required to file a motion for reconsideration of Judge Manos' order in order to object to Judge O'Malley's legal determination and preserve that objection for appeal, regardless of the legal resources wasted as a result of the district court's error.

Thus, Defendants did not waive their objection to the instruction that adverse employment actions took place as a matter of law.

### B.      Merits of the Jury Instruction

Having found that Defendants did not waive their right to challenge the district court's jury instruction concerning the adverse employment action element, I would then hold that the instruction itself was improper and would reverse on that ground.

As an initial matter, it is worth clarifying that a district court unquestionably has the discretion to determine that there is no dispute of fact with respect to an employer's conduct toward an employee, and that the employer's conduct constitutes an adverse employment as a matter of law. When a district court properly makes that determination, it may instruct the jury accordingly.

However, where the law does not clearly indicate whether the undisputed facts concerning an employer's conduct render the conduct an adverse employment action, a judge must allow the jury to decide whether an adverse employment action has occurred. The jury should have decided whether an adverse employment action occurred in this case for the reasons that follow.

### 1. Gym Detail

Judge Manos was incorrect to decide that the gym detail constituted an adverse employment action as a matter of law. Accordingly, that ruling cannot provide an independent justification for Judge O'Malley's jury instruction that the gym detail was an adverse employment action as a matter of law.

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted). "We have held that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is *not* an adverse employment action." *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (quotations and citation omitted); *see also Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987) (reassignment or demotion without reduction in salary and benefits is not adverse employment action); *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) ("We have repeatedly held, however, that neither an internal investigation into

- 30 -

suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action.").

As part of his denial of Defendants' motion for summary judgment, Judge Manos found as a matter of law that the gym detail constituted an adverse employment action. In doing so, he distinguished this case from this Court's precedent finding an administrative leave pending an investigation not to constitute an adverse employment action by citing what he considered to be the unique aspects of Lentz' gym detail, including "(1) the loss opportunities for overtime and secondary employment, (2) the significant differences between gym duty and active duty, (3) the uniqueness of police work rendering this reassignment particularly undesirable, (4) the fact that officers do not like gym duty; and (5) the length of the investigation[.]" (J.A. at 138-39.) Regarding loss of overtime, this Court has never established a binding precedent that the loss of overtime pay *requires* a finding of an adverse employment action. *See, e.g., Broska v. Henderson*, 70 F. App'x 262, 267-68 (6th Cir. 2003) ("[T]he denial of overtime *can* constitute an adverse employment action.") (emphasis added). In fact, as Judge Manos noted, this Court has even held that as a matter of law, the loss of overtime does *not* constitute an adverse employment action. *See Smith v. County of Hamilton*, 34 F. App'x 450, 456 (6th Cir. 2002) ("Nor do [the plaintiff's] claims regarding her loss of opportunity for compensatory time establish that her transfer was an adverse employment action."). As for the general undesirability of gym duty (factors two through four cited by Judge Manos), there is no dispute that by itself, the reassignment of an officer to gym duty pending investigation of a use-of-deadly-force incident is not an adverse employment action. Accordingly, the fact that officers do

not like being on gym duty or find it unpleasant is not enough to render gym duty an adverse employment action as a matter of law; if it the officers' unhappiness with the reassignment were sufficient, then any length of time on gym detail would constitute an adverse employment action.

Thus, the only factor cited by Judge Manos that actually could have rendered the gym duty an adverse employment action as a matter of law was its length in Lentz' case. The only precedents Judge Manos cited for the proposition that a long suspension with pay could constitute an adverse employment action as a matter of law were two cases–*Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), and *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)–which expressly found that a suspension with pay for a short period of time did *not* constitute an adverse employment action. Judge Manos reasoned that "[t]he corollary to both of these cases is that a suspension with pay or removal for a prolonged period of time can constitute adverse employment actions." (J.A. at 138.) Judge Manos was correct that a long suspension with pay *can* constitute an adverse employment action. However, it does not follow from the fact that a short suspension with pay cannot constitute an adverse employment action that a longer suspension with pay *must* be an adverse employment action. In short, Judge Manos did not have any legal basis to find that the extended gym detail was an adverse employment action as a matter of law.

At the conference to discuss proposed jury instructions, Judge O'Malley cited Judge Manos' summary judgment opinion to support her decision to instruct the jury that the extended gym detail

was an adverse employment action as a matter of law. For the reasons discussed, the summary judgment ruling she cited was incorrect. Her other independent basis for giving that instruction to the jury was that the evidence adduced at trial rendered the court's summary judgment order "well-supported." (J.A. at 3313.) Along these lines, Judge O'Malley told Defendants that "[w]hile you certainly did your best to introduce testimony that it's a fun thing to be in gym duty, I think that the unrebutted testimony was that gym duty for two and a half years was an adverse employment action, and that it was viewed by all of the officers who testified as punitive, and you didn't – weren't able to get anybody to concede that staying in gym duty for two and a half years would be something that they would enjoy, even if you got them to say that gym duty for a few months was nice because they could work out." (J.A. at 3313.) Subsequently, in denying Defendants' post-verdict motion for judgment notwithstanding the verdict, the court again cited Judge Manos' summary judgment order, and reiterated that as an independent ground, it found the evidence adduced at trial to "includ[e] *substantial* testimony that gymnasium duty was dirty, dismal and prevented officers from earning overtime and engaging in secondary employment." (J.A. at 81.) The court's post-verdict ruling also stated that "there was really no credible testimony to the contrary on this point." (J.A. at 81.) In so finding, Judge O'Malley repeatedly disregarded evidence Defendants introduced to oppose Lentz' contention that the harshness of Lentz' gym duty did not rise to the level of an adverse employment action.

Since the majority opinion does not refer at all to this evidence, this opinion will briefly summarize some of it. Regarding the harshness of the conditions, Ellis Johnson, who supervised

gymnasium duty during the time Lentz was detailed there, testified that officers on gym detail could leave the gym to spend time with their family upon request, and such requests were never refused. Johnson stated that officers were free to come and go as they pleased. Although several officers testified that they did not like being on gym detail and none would have wanted to be there as long as Lentz was, two officers testified that they did not mind being on gym detail, with Lieutenant Klimak, who had previously spent time on gym detail, stating, "So you're getting paid 20 or $25 an hour to work out, to lift weights, to play basketball. I wouldn't consider it a punishment, sir." (J.A. at 3145.) Judge O'Malley dismissed this testimony as not credible, and it may very well not have been credible, given Lieutenant Klimak's role in Lentz' investigation; however, such a determination was for the jury, and not the district court, to make. Regarding loss of overtime and extra employment opportunities, beginning in March 2002, the City allowed non-police-related secondary employment for officers on gym detail, as long as they sought permission from the deputy chief of police. Further, Lentz acknowledged on cross-examination that, contrary to his previous assertion, he hardly engaged in secondary employment at all during the year prior to his gym duty. As for the length of gym duty, Police Chief Edward Lohn testified that Robert Beck, the police union president who acted as Lentz' advocate during the investigation, had agreed that the gymnasium was the best place for Lentz to be until the departmental charges could be resolved; although Beck denied making that statement, this dispute was a question of credibility for the jury, which could have found Beck's support for Lentz' reassignment to gym detail to be evidence that it did not rise to the level of an adverse employment action.

The district court was correct that there was substantial evidence at trial that would support a finding that the gym detail constituted an adverse employment action: there was unrebutted testimony that the gym was dirty and windowless, that it eliminated the opportunity for overtime pay, and that no officer would have wanted to stay there for almost two years. Such evidence would have certainly been sufficient to uphold a jury finding–but the jury was never given an opportunity to make that finding. Judge O'Malley may also have been correct that Defendants' opposing testimony was not credible, or that it could not serve to rebut the punitive nature of the gym duty. However, in making those findings, she clearly impeded on the role of the jury as the factfinder.

In sum, given our well-established precedents holding that paid administrative leave pending the resolution of an investigation is not generally an adverse employment act, and given the disputed circumstances concerning the gym detail, the question of whether the Lentz' gym detail was a disputed issue of fact that should have been presented to the jury.

### 2. Departmental Charges

When Judge O'Malley instructed the jury that the filing of departmental charges against Lentz was an additional adverse employment action, she could not base that decision on Judge Manos' summary judgment ruling, since Judge Manos never found that the departmental charges constituted an adverse employment action. In fact, Judge Manos' only reference to the departmental charges occurred in his discussion of Lentz' retaliation claim, for which he actually granted Defendants' motion for summary judgment. In the retaliation context, Judge Manos stated: "The

filing of departmental charges, in and of itself, does not constitute an adverse employment action." *Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 695 n.10 (N.D. Ohio 2006). Because an adverse employment action is a broader standard in the retaliation context than the discrimination context, *see Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (6th Cir. 2006), the only reasonable interpretation of Judge Manos' summary judgment ruling is that the filing of departmental charges would also not amount to an adverse employment action in the context of a discrimination claim. It is inexplicable, then, how Judge O'Malley believed that Judge Manos "also stated that the pursuit of those charges after the criminal charges were dropped might lead a reasonable jury to conclude that the charges were motivated by discriminatory intent." (J.A. at 81.)

Judge O'Malley did not cite any case law, either during the charging conference or in her post-verdict opinion, to support her decision to instruct the jury on the departmental charges. The omission of any legal analysis was particularly glaring because the court had never previously ruled on whether the filing of departmental charges was an adverse employment action, and Lentz never sought such a finding in a motion or in his requested jury instructions. Instead, Judge O'Malley provided the following reasons for her decision. First, during the charging conference, she stated that "[w]hile the defendants argue that the departmental charges flow as a matter of course, from the filing of the criminal charges, and there was some testimony that that always happens, first of all, I think there was not sufficient testimony that by law it's required to happen; and secondly, and perhaps more importantly, even when those charges disappeared, the departmental charges, rather than disappearing, were amended and prolonged." (J.A. at 3313.) In her opinion denying

Defendants' post-verdict motion for judgment notwithstanding the verdict, Judge O'Malley added to this analysis by stating, without citing any legal authority, that "to the extent that the filing of departmental charges extended Lentz's gymnasium duty, the filing of those charges are intertwined with the gymnasium duty. The departmental charges, therefore, go beyond mere *threats* of discipline." (J.A. at 82.)

Neither of the reasons Judge O'Malley provided were valid. First, there is no precedent in this Court's jurisprudence for finding the continuation of gym detail after the dismissal of the criminal charges to constitute an adverse employment action as a matter of law, and other circuits have found just the opposite. *See Joseph v. Leavitt*, 465 F.3d 87, 92 (2d Cir. 2006) ("We conclude that the [employer's] decision not to reinstate [the plaintiff] immediately after dismissal of the criminal charges did not alter the terms and conditions of [the plaintiff's] employment, and thus did not constitute an adverse employment action."). Second, Judge O'Malley appeared to base her decision at least partly on a rejection of Defendants' explanation that the charges flowed automatically from the criminal charges against Lentz. In addition to making an inappropriate credibility determination here, the court also appeared to confuse the elements of the claim; the *reason* Defendants brought the departmental charges should not be relevant to whether the departmental charges are an adverse employment action, but only concerns whether the departmental charges were the result of discrimination. Third, it is nonsensical and misleading to instruct the jury that the departmental charges are adverse actions because their filing extended Lentz' gym detail, when the court was already instructing the jury that Lentz' extended gym detail was an adverse

employment action. In other words, if, as Judge O'Malley indicated, the only aspect of the departmental charges that rendered them adverse as a matter of law was the extent to which they lengthened Lentz' gym duty, then the departmental charges would not create any more adversity for Lentz than he was already experiencing from the gym duty. However, when the court informed the jury of two distinct adverse employment actions, the jury could only have concluded the charges themselves, and not the degree to which they extended Lentz' gym duty, were adverse. Yet the evidence adduced at trial did not include any adverse effect of the departmental charges, other than the fact that it further delayed the end of Lentz' gym detail.

Thus, the court found the departmental charges to be adverse as a matter of law in the absence of any evidentiary basis independent of the gym detail, in the absence of case law supporting the decision, and even in the absence of a request from Lentz that the jury be given such an instruction. The court's instruction with respect to the departmental charges was therefore both improper and incorrect as a matter of law.

###     C.     Sufficiency of Adverse Employment Action Evidence

In addition to refusing to address Defendants' argument that the district court improperly instructed the jury that the gym detail and the departmental charges were adverse employment actions as a matter of law, the majority also refuses to address Defendants' related argument that there was insufficient evidence at trial to support the adverse employment action element. This time, the majority's justification for its unwillingness to consider Defendants' argument is that

"[f]ollowing a trial on the merits, our review focuses on the 'ultimate question of discrimination, and not the prima facie case.'" Majority Op. at 4 (quoting *Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 720 (6th Cir. 2004).

The majority opinion misapplies *Noble*. The majority is correct that after a trial on the merits, we cannot revisit the district court's finding that Lentz made out a prima facie case, or its decision to deny Defendants' motion for summary judgment. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). However, "that is not to say that the evidentiary underpinnings of a plaintiff's prima facie case are irrelevant or insulated from examination by this court to aid its determination whether the evidence *in toto* is sufficient to support a finding of intentional discrimination." *Noble*, 391 F.3d at 725. In *Barnes*, for example, because the defendant argued on a sufficiency-of-the-evidence appeal that the evidence was insufficient to find that the plaintiff was a member of a protected class and that he was treated differently than similarly situated employees, this Court analyzed those elements individually to determine whether the evidence adduced at trial supported them. *Barnes*, 401 F.3d at 736-37.

Yet more importantly, the principle in *Noble* applies specifically to a district court's *denial* of a defendant's motion for summary judgment in an employment discrimination case. In *Noble,* this Court explained the rationale for the rule by quoting from the Supreme Court:

> [W]hen the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, *the fact finder must then decide* whether the

rejection was discriminatory within the meaning of Title VII. At this stage, the *McDonnell-Burdine* presumption [in a motion for summary judgment] "drops from the case," and "the factual inquiry proceeds to a new level of specificity."

*Id.* at 720-21 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983)) (emphasis added). Thus, the precedents of *Aikens* and *Noble* stand only for the proposition that there is no purpose to revisiting the plaintiff's initial prima facie case in an employment discrimination case after a court denies a summary judgment motion, because the evidence is presented a second time with greater specificity at trial; in that context, the only relevant question is whether the evidence presented at trial was sufficient to prove discrimination. *See Aikens*, 460 U.S. at 713-15 ("Because this case was *fully* tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether *Aikens* made out a prima facie case. . . . The [factfinder] has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'") (emphasis added).

Yet here, the entire question of whether there was sufficient evidence to uphold the jury's verdict is irrelevant, because the jury never had the chance to reach a complete verdict once its deliberations were unduly circumscribed by the court's instructions. Certainly, there was sufficient evidence at trial to support a jury finding of discrimination. However, the jury never rendered a verdict on the "ultimate question of discrimination," *see Noble*, 391 F.3d at 720, because it never ruled on whether Defendants' alleged discrimination caused an adverse employment action, or whether Defendants actually retaliated by taking a materially adverse employment action. Reading

Nos. 07-4385/07-4386
*Lentz v. City of Cleveland, et al.*

*Noble* so as to foreclose Defendants' challenge to the district court's decision to rule for one party as a matter of law with respect to a key issue in the case, as the majority does, insulates the district court's interpretation of a legal question from any appellate review. Our decision in *Noble* surely cannot be read so broadly.

In sum, the majority glosses over the central, fatal defect of the trial: that the jury never had the chance to decide on a critical element of the claim. The conduct of the trial was by definition egregiously defective as a matter of law because, had the jury been properly instructed, it could have reached a verdict favorable to either Lentz or Defendants, and there would have been sufficient evidence for either verdict to be sustained. As it were, the court's rulings deprived the jury of its factfinding function.

This was undoubtedly a hard-fought trial, with significant resources expended by both sides. In such cases, the temptation exists not to disturb the judgment merely because of underlying procedural defects. Nevertheless, we cannot abdicate our duty to ensure that adversaries have had the opportunity to present their cases in full to a jury when the law does not clearly resolve a claim, or an element of a claim, in one party's favor. I therefore respectfully dissent.